```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION
```

**COLUMBIA GAS TRANSMISSION CORP.,**
    Plaintiff,

  vs.          Civil Action 2:05-CV-1090
               Magistrate Judge King

**BRIAN GANSON,** *et al.,*
    Defendants.

## OPINION AND ORDER

  Plaintiff, the successor in interest to a lessee entitled to enter defendants' real property for the purpose "injecting, storing, removing and marketing gas," *Complaint,* ¶12, brings this action seeking declaratory and injunctive relief[1] in connection with improvements on defendants' property that allegedly encroach upon plaintiff's gas storage well ("Well 10956" or "the well"). Defendants filed counterclaims under Ohio law in connection with damage allegedly caused by plaintiff to defendants' property while accessing Well 10956. The Court is vested with diversity jurisdiction under 28 U.S.C. §1332.[2] With the consent of the parties, 28 U.S.C. §636(c), trial to the Court, including a view of various premises, began on October 1, 2006.[3] Pursuant to the provisions of F.R. Civ. P. 52, the Court now makes the following findings of fact and conclusions of law.

## FACTS

  In December 1951, Emery L. and Alice F. Huffines, property owners in Laurel Township, Hocking County, Ohio, granted a lease to the

---

[1] The original complaint also sought monetary relief; however, plaintiff has waived all such claims. *Order,* Doc. No. 56.

[2] Plaintiff has waived any claim based on an alleged violation of federal law. *Order,* Doc. No. 56.

[3] The parties waived trial by jury. *Order,* Doc. No. 56.

Ohio Fuel Gas Company, plaintiff's predecessor in interest. The lessee was granted

> all the oil and gas in and under the land hereinafter described, together with the exclusive right at all times to enter thereon and drill for, produce, and market oil and gas and the exclusive right to inject, store and remove gas, regardless of the source thereof, in and of the oil and gas strata underlying said premises, **and to possess, use and occupy so much of said premises as is necessary and convenient for the purposes herein specified,** for a term of twenty (20) years and so much longer thereafter as oil or gas is produced therefrom in paying quantity, or gas is being injected and stored therein or removed therefrom.
> ...

*Plaintiff's Exhibit 1* (emphasis added). Well 10956 was drilled on the leased premises as a production well in approximately 1971. It was later converted to a storage well, in which natural gas is stored during summer months and from which natural gas is removed during the winter heating months. The well remains in use today.

The terrain surrounding Well 10956 is not completely flat. The land to the east of the well slopes up from the well but is relatively unobstructed by trees. *See Defendants' Exhibit A3*. A lease road, constructed by the lessee to facilitate access to and maintenance of Well 10956, approaches from the northeast. *Id.; Plaintiff's Exhibit 3*. Along the west side of the well, all parties agree, is a natural ravine that grows increasingly deep as it extends from north to south. A fresh water spring emerges from the top of the ravine, which is filled with heavy brush and other vegetation. *Plaintiff's Exhibit 3*. John H. Cavinee, who has tended Well 10956 for plaintiff since 1985, testified that, in all those years, plaintiff has never approached Well 10956 from the west for any purpose.

2

In February 2001, defendants Brian and Toni Ganson purchased a parcel of undeveloped real estate upon which Well 10956 is located. *See Exhibit D,* attached to *Complaint*.[4]  Brian Ganson, who is able to operate earthmoving equipment, almost immediately installed a long driveway from the nearest road. See *Defendants' Exhibit C1.*  The Gansons also planned a residence, and initially envisioned their home on the hilltop near Well 10956.

The Gansons knew about the well at the time they purchased the property and knew, at least, that a lease vested plaintiff with some rights to the property.  During the course of conversation with a representative of plaintiff, in connection with the construction of the driveway, Brian Ganson was advised that the home site then contemplated by defendants was within 300 feet of the well and would therefore be too close.  The Gansons, for reasons unrelated to the proximity of Well 10956, eventually located their residence elsewhere on the property, moving into their new home in 2002.

In August 2003, Brian Ganson began excavation of a pond northwest of Well 10956, at the top of the ravine where a number of hills converge.  Without changing the downward slope of the terrain from the well, he constructed a dam or levy across the ravine.  *See Defendants' Exhibits A1, A5*. Working evenings and weekends, Brian Ganson essentially completed excavation of the pond in two to three weeks.  When only spreading of topsoil and seeding of grass remained to be done, plaintiff's well tender, John Cavinee, advised Brian Ganson that the pond was too close to Well 10956, directed him to stop work on the project,

---

[4]The Gansons currently own a number of parcels in close proximity, totaling approximately 26 acres. *Defendants' Exhibit C1.*

and suggested that Ganson call John Rader, plaintiff's land agent. Brian Ganson continued with the project and did not initiate contact with John Rader.[5]

The pond is just under one acre in surface. At its closest, the pond is located approximately 70 feet from Well 10956; the farthest edge of the pond is 234 feet from the well. *Plaintiff's Exhibit 3.*[6] *See also Defendants' Exhibits A1, A5.*

Brian Ganson testified that the pond provides entertainment for his family and, considering that the nearest water source is more than seven miles away, a useful resource in case of fire. The placement of the spring fed pond at the top of the ravine was, as even Brent Criser agreed, logical. Moreover, the thick brush in the ravine, which grows to 10 feet in height, cannot be controlled and presents a sanctuary for deer.

Brian Ganson knew, from the time that he constructed his driveway, that plaintiff claims a 300' radial setback around its wells. His own review of the lease, however, persuaded him that, although plaintiff was prohibited by the lease from drilling a well within 300 feet of a barn or dwelling absent consent,[7] the lease imposed no similar

---

[5] Brian Ganson also constructed a road extending from approximately the lease road to the Gansons' residence. Located along that road, approximately 175 feet from Well 10956, is an outhouse, or privy, constructed of wood and positioned on landscape timbers or skids. *See Plaintiff's Exhibit 3*. Although plaintiff alleged that the privy also encroaches on Well 10956, *Complaint,* at ¶21, Brent Criser testified at trial that he is not concerned about that structure which could, if necessary, be easily removed.

[6] These findings are based on measurements by Brent Criser, plaintiff's storage engineer, using a laser range finder. Defendant Brian Ganson's measurements, using a tape measure, place the nearest point of the pond at 105 feet from the well head. *Defendants' Exhibit A4.* The Court finds that Criser's measurements are more reliable than are Ganson's.

[7] "No well shall be drilled within 300 feet of the barn or dwelling on said premises without the consent of Lessors." *Plaintiff's Exhibit 1*, at p.2.

restriction on the landowner.  According to Brian Ganson, John Rader explained, when challenged, that plaintiff "turn[s] [the 300 foot restriction] around" and imposes the same restriction on the landowner.

Plaintiff has an excellent history of safety in connection with its well operations in the Laurel well field.  Brent Criser, a storage engineer for plaintiff, supervises approximately 2,500 wells. He testified that, in approximately 2000 (*i.e.,* prior to his employment by plaintiff), plaintiff formed an "encroachment team" to deal with the serious issue of structures throughout the Laurel well field in close proximity to its wells.  Plaintiff formulated a new standard requiring a 300' setback policy from each well and determined that enforcement would focus initially on preventing new encroachments; existing encroachments would be addressed only as time and resources allowed. Criser testified that the 300' setback policy, which equals approximately 6.5 acres of land, is necessary to protect against every "worst case scenario" and to enable plaintiff to meet its obligations under Ohio Admin. Code §1501:9-9-02, which provides in pertinent part:

> All owners, contractors and persons or organizations in control of wells being drilled, reworked, reconditioned, deepened, plugged back, produced, shut-in or plugged prior to abandonment shall use all reasonable means to safeguard against hazards to life, limb and property. ...

Criser acknowledged that the actual amount of land necessary to access and maintain its wells depends on the topography of the surrounding land.  If the terrain is flat and clear, less space is needed to access the wells. On the other hand, terrain that is hilly, or for some other reason unusable, necessitates a greater setback.  He expressly testified that, because of the topography surrounding Well 10956,

5

plaintiff reasonably needs the full 300' setback, and removal of the pond, to assure proper access to the well. Although a nearby water source could be useful in the maintenance of a well, the Gansons' pond is, in the final analysis, more of a hindrance to plaintiff's operations than a benefit.

  Criser testified that the proximity of the pond to Well 10956 presents two areas of concern.  It limits the space available for the large equipment that plaintiff must sometimes utilize in the maintenance of its well; indeed, plaintiff's maintenance of Well 10956 since construction of the pond has required very careful placement of equipment.  The pond also poses an environmental hazard should the pond be contaminated by a discharge of natural gas or other substances utilized in plaintiff's maintenance of the well. These constraints impede plaintiff's ability to operate and maintain Well 10956, pose risks to plaintiff's employees and other persons in close proximity to the well and generally prevent plaintiff from taking "all reasonable means to safeguard against hazards to life, limb and property. ..." Ohio Admin. Code §1501:9-9-02.

  Criser described a number of maintenance procedures routinely performed on plaintiff's wells. For example, a coil tubing clean out requires a non-articulating piece of equipment slightly smaller than a tractor trailer in addition to other vehicles and pieces of equipment, some carrying nitrogen and acid.  This procedure was in fact performed on Well 10956 within the past year and, according to Criser, "went without a hitch." A fracture stimulation uses hydrostatic pressure to break the Clinton rock and sand to hold the

fractures open, thereby increasing the deliverability of the well. This procedure was also successfully performed on Well 10956 in 2007, resulting in an increased deliverability of that well. A log and perforate procedure, in which the integrity of the well casing and the rock formation are evaluated, may require a number of vehicles, including a solid framed logging truck and a crane, as well as explosives.[8] According to Criser, this procedure has almost certainly been performed on Well 10956 in recent years. Yet another maintenance procedure is a rig workover, which requires derrick rigs and other trucks and tools, tanks containing both water and drilling fluid, the construction of earthen pits and the storage of pipe and other materials. Criser did not foresee the need for this procedure on Well 10956. Eventually, however, the well will reach the end of its useful life and will have to be plugged. Drilling a new well typically requires a 200' x 300' path. However, Criser does not anticipate a need to plug Well 10956 in the near future.

Routine maintenance of natural gas wells can also present pollution risks. For example, wells can sometimes release natural gas even during routine maintenance. Valves on the well, such as those on Well 10956, can be used to control such modest leaks, however. Moreover, trucks and other equipment used in routine

---

[8]Logging is performed frequently to inspect casings; perforation, which can render the well worthless, is performed less frequently.

maintenance may present sources of toxic emissions.

Criser also testified to emergency conditions that could arise in connection with natural gas storage wells.  A blow out, *i.e.,* the uncontrolled release of natural gas resulting from the catastrophic failure of a well, is one such emergency, and can result in an uncontrolled fire.  Moreover, increased deliverability of a particular well will increase the amount of natural gas released during a blow out.  In this regard, Criser noted that the fracture stimulator performed on Well 10956 resulted in an increase in the deliverability of that well.  Plaintiff hires contractors to control blow outs or fires.  Baker Atlas, whose closest facility is located two to three hours away in Wooster, Ohio, would be used to contain a major well leak.  Boots & Coots, an international well control business located in Houston, Texas, or Wild Well Control, also located in Texas, would be called in the event of a well fire. Local authorities may also require evacuation of the populace in the event of a catastrophic event. However, Criser is unaware of any blow outs or fires in the Laurel storage field.

Criser acknowledged that, prior to the construction of the pond, the ravine on which it was built was too steep to be usable by plaintiff for access to Well 10956 under normal circumstances.  However, in an emergency, the land could have been leveled and thereby rendered usable.  Now, should an emergency arise, plaintiff would have to drain the pond prior to leveling the

8

land.

Moreover, Criser testified, access to the well has been adequate for all maintenance required thus far, and the Ganson pond does not render impossible any work that plaintiff might have to perform on Well 10956 in the foreseeable future. Nevertheless, the proximity of the pond to Well 10956 requires extreme care in placing equipment around the well, with a concomitant delay in work. Moreover, the wind direction may dictate the placement of equipment used in response to an emergency; if conditions require access from the northwest, critical time could be lost in having to drain the pond prior to leveling the land. Furthermore, Criser testified, there is a potential for fire if ignition sources, such as trucks, are placed too close to the well. Finally, Criser testified that the pond could be contaminated by natural gas or other substances used in connection with well maintenance, thus presenting an environmental hazard; he acknowledged, however, that the presence of the natural spring in the ravine also presented a risk of pollution.

Defendants presented evidence of other premises, located relatively near the Ganson property, on which structures are located within 300' of wells owned or operated by plaintiff.[9] Most of the encroachments were constructed prior to the formulation of the plaintiff's current 300' setback policy; that policy therefore contemplates action regarding these premises as plaintiff's time and

---

[9] The Court, accompanied by counsel, viewed those premises, as well as the Ganson property, on the last day of trial.

resources permit.[10]  In each instance, Criser was unaware of any effort on plaintiff's part to remedy the encroachment.  In most instances, Criser also testified, the topography of these premises is such as to permit reasonable access to the well notwithstanding the encroaching structure.

The well on property owned by Sharlene Gray is located in a bottom area bounded on one side by a creek and a steep hill and on the other side by a pond that is quite close to the well. Ms. Gray testified that the pond was constructed after plaintiff granted a variance in 1988 to alleviate the effects of severe drought conditions on livestock.  *See Defendants' Exhibits B7A, B7B, B7C*.[11] Although the topography of this property would permit relatively easy access to the well, the presence of the creek and the pond could pose the same risk of pollution identified by Criser in connection with the Ganson pond.

The business known as Glen Laurel is located on property with one of plaintiff's wells.  *See Defendants' Exhibits B1, B2*.  The well is located on relatively flat land in a narrow, generally oblong configuration; the well is bordered on one side by a treed ravine, on the other side of which is a cabin within 300' of the well.  The other side of the well is bordered by a relatively steep, but low, hill. The topography does not permit unobstructed access to the well from all directions; a change in wind direction could presumably present problems of the sort testified to by Criser in connection with the Ganson pond.

---

[10] An exception is the residence constructed in 2006 on premises owned by Terry Phillips, *see Defendants' Exhibit B15H,* which is located 290' from the wellhead.  Criser indicated that plaintiff's 300' setback policy would not be enforced as to this structure.

[11] Brian Ganson testified that his request for a variance was denied.

*Defendants' Exhibit B4* depicts premises with a barn-like structure and at least two motor vehicles within 300' of plaintiff's well. The motor vehicles could, presumably, pose sources of ignition.

A pond situated quite close to plaintiff's well on property owned by Charles Ogle, *see Defendants' Exhibits B6A, B6B*, would presumably present the same risk of environmental pollution presented by the Ganson pond. That pond is also surrounded by an electric fence which, Criser acknowledged, could present a potential ignition source.

An inhabited dwelling situated approximately 150' from plaintiff's well is depicted in *Defendants' Exhibit B8.* Criser testified that this encroachment presents a "pretty significant" safety issue, yet he was unaware of any plans on the part of plaintiff to ameliorate the situation.

Some of defendants' exhibits, e.g., *Defendants' Exhibits B10, B11,* also reflect older buildings located less than 150' from a well.

During its view of the premises, the Court also noted other encroachments, including piles of wood, metal and pieces of large equipment, located in close proximity to wells.[12]

Brian Ganson also testified in support of defendants' counterclaims relating to alleged damage to their property. In approximately August 2003, plaintiff's equipment "rutted up" the Ganson field near the well. Brian Ganson used a bulldozer to regrade the damage to the field, a process that took him 3-4 hours. He estimated that the reasonable cost of repair for the damage, including rental of the dozer

---

[12]The Court did not consider any evidence relating to premises reflected in *Defendants' Exhibits D12, D13* because the well shown in those exhibits is not owned or maintained by plaintiff.

11

and operator's pay at scale, is at least $1,500.  That testimony is uncontroverted in the record, although John Cavinee, the well tender assigned to Well 10956, testified that he is aware of no damage to the Ganson property.[13]

### DISCUSSION

The lease at issue in this action provides plaintiff

> the exclusive right at all times to enter thereon and drill for, produce and market oil and gas and the exclusive right to inject, store and remove gas, regardless of the source, ... **and to possess, use and occupy so much of said premises as is necessary and convenient for the purposes specified [in the lease]** . . . .

*Plaintiff's Exhibit 1.*  Plaintiff takes the position that a 300' radial setback is reasonably necessary to effect its rights and obligations under this lease and asks that the Gansons be required to remove their pond at their own expense.  Plaintiff specifically argues that a 300' setback is reasonably necessary to preserve the safety and welfare of persons and property and to permit plaintiff to meet its obligations under the general safety regulation reflected in Ohio Admin. Code §1501:9-9-02.

Nearly identical language has been interpreted by the United States Court of Appeals for the Sixth Circuit in another case brought by plaintiff.  *Columbia Gas Transmission Corp. v. Zeigler*, 83 F. Appx. 26

---

[13] Defendants also proffered the testimony of Michael P. McCormac, manager of the Oil and Gas Permitting Section of the Ohio Department of Natural Resources, Division of Mineral Resources.  He testified that the only minimum setback established by Ohio laws and regulations governing wells requires only that wells be drilled no closer than 100' from structures likely to be occupied.  Ohio Admin. Code §1501:9-1-05.  He expressed no opinion as to the actual setback reasonably necessary to effect the purposes of the lease at issue in this action.  Jerry D. Jordan, who testified that he is familiar with storage wells primarily through his 25 years as an attorney, testified that, in Ohio, the language contained in the Huffines lease is ordinarily construed as requiring a 100' setback.  His view of the Ganson premises persuaded him that the Ganson pond will not impede plaintiff's ability to properly maintain Well 10956.  The Court did not rely on any opinion testimony offered by these witnesses.

(6th Cir. 2003) ("no well shall be drilled within 300' of the barn or dwelling house now on said premises" and lessee is entitled to use and occupy so much of the premises "as may be reasonably necessary and convenient for" the purposes set forth in the lease).  In *Zeigler*, the dispute was analogous to the dispute presently before this Court, *i.e.*, plaintiff Columbia Gas requested declaratory and injunctive relief granting it a 300' setback from one of its natural gas wells.  The district court ultimately granted plaintiff a 200' setback, a decision that was affirmed in *Zeigler, supra.* This Court has previously concluded that the reasoning in *Zeigler* is dispositive of the issues presented by plaintiff's *Complaint* in this case.  *Opinion and Order*, Doc. No. 28.

*Zeigler* concluded that the lease language provides "Columbia with the right to call for a setback if it is 'reasonably necessary and convenient' for the purpose of storing gas in the well of the subject area." *Zeigler*, 83 F. Appx. at 30.  The court observed that the question of what constitutes a reasonably necessary and convenient setback is "particularly fact-sensitive." *Id.* Where the specific terms of the easement are not expressed in the lease itself, determining the dimensions or reasonableness of use becomes a question of fact.  *Crane Hallow Inc. v. Marathon Ashland Pipe Line*, 138 Ohio App. 3d 57, 67 (2000).

Plaintiff acknowledges that it has adopted a policy that calls for a uniform 300' radial setback around all its wells.  Plaintiff also argues that the particular features of the Ganson property militate in favor of a 300' setback in this instance, pointing to Brent Criser's conclusory testimony that a 300' setback is reasonably necessary to its operation and maintenance of Well 10956. However, a careful consideration

of the evidence in this case simply does not support that conclusion.

The evidence establishes that, since Well 10956 was originally drilled in 1971, access from the northwest, where the pond is now located, has never been required. John Cavinee, who has tended Well 10956 for more than twenty years, testified that the presence of the pond has not impeded his work. Even Brent Criser testified that many of the major maintenance operations requiring large pieces of equipment have been successfully performed on Well 10956 despite the presence of the pond. Other maintenance operations that require large pieces of equipment are unlikely to be required in plaintiff's maintenance of Well 10956 and the most extreme sort of catastrophe, a well blow out, is unlikely to occur. Even assuming the unlikely, *i.e.*, that a blow out or fire were to arise, and that access from the northwest were required by the direction of the wind at the time, the presence of the pond is unlikely to meaningfully impede plaintiff's (or its contractor's) ability to respond, since – even without the pond – the deep natural ravine upon which the pond was built would pose a significant impediment to a prompt response. Plaintiff's assertion that the pond presents an environmental hazard is entirely unpersuasive in light of the undisputed fact that a fresh water spring, equally susceptible to pollution, has been present in the ravine since the time of the original drilling of Well 10956.

Plaintiff's contention that a 300' setback on the Ganson property is reasonably necessary to effectuate the terms of the lease is at once too broad and too narrow. There is no evidence that any reasonably foreseeable maintenance operation will actually require a 300' radial setback; yet a truly catastrophic event – however unlikely – could easily require much more space than a 300' setback would provide. One

14

is tempted to conclude that, by this action, plaintiff is attempting to establish its uniform 300' radial setback policy under the guise of the particularized factual inquiry mandated by *Zeigler*.

Although plaintiff characterized as irrelevant defendants' evidence of other encroachments, it is significant that plaintiff has adopted a different standard with respect to these properties. Most significant in the Court's view is the fact that plaintiff has done nothing to ameliorate what Brent Criser characterized as the "significant" safety hazard presented by the inhabited structure depicted in *Defendants' Exhibit B8*.

This Court concludes that plaintiff has failed to establish its claim that a 300' radial setback surrounding Well 10956 is reasonably necessary for the purposes of the lease. The Court further concludes that plaintiff has failed to establish that the Ganson pond impedes in any significant respect plaintiff's ability to access Well 10956 for purposes of either routine maintenance or response to an emergency. On plaintiff's claims, then, the Court finds for the defendants.

In reaching these conclusions, the Court hastens to make clear what it has **not** resolved: the Court expresses no opinion as to what a reasonable radial setback from Well 10956 might be for all purposes. Indeed, having rejected plaintiff's evidence regarding the reasonableness of a 300' setback, the Court lacks an evidentiary basis for making such a determination. The Court merely concludes that the Ganson pond, constructed on a spring-fed ravine that was essentially unusable by the plaintiff, does not prevent plaintiff from "possess[ing], us[ing] and occupy[ing] so much of [the Ganson] premises as is necessary and convenient for the purposes herein specified." *Plaintiff's Exhibit 1*.

15

As for defendants' counterclaims, the Court concludes that defendants have established, by the uncontroverted and credible evidence of Brian Ganson, that defendants are entitled to judgment in the amount of $1,500.00 in compensation for damage caused by plaintiff to their property.

**CONCLUSIONS OF LAW**

This Court has jurisdiction over the claims asserted in this diversity action. 28 U.S.C. §1332. The Court is vested with jurisdiction over the parties.

The Court concludes that plaintiff has failed to establish its claims for declaratory and injunctive relief against defendants.

The Court further concludes that defendants have established their counterclaims and are entitled to judgment against plaintiff in the amount of $1,500.00.

The Clerk shall enter **FINAL JUDGMENT** accordingly.

November 30, 2007                    *s/ Norah McCann King*
                                     Norah McCann King
                                     United States Magistrate Judge